OPINION OF THE COURT
Carolyn E. Demarest, J.
Defendant Rafael Jimenez is a convicted sex offender pursuant to Correction Law § 168-a, having pleaded guilty on April 6, 1994 to one count of attempted rape in the first degree, a lesser-included crime of count I of the indictment charging rape in the first degree under Penal Law § 130.35 (3), commonly known as “statutory” rape. All other charges in the *321 indictment (one count of sexual abuse in the first degree under Penal Law § 130.65 [3] and two counts of endangering the welfare of a minor) are also based upon the age of the victim. There are no allegations of forcible compulsion per se. Defendant has challenged his proposed “moderate” risk level designation under the Sex Offender Registration Act as not consistent with the facts of his case and his due process rights.
THE STATUTE
Correction Law article 6-C, the Sex Offender Registration Act (the Act), effective January 21, 1996, modeled after New Jersey’s “Megan’s Law”, was meant to address the need to protect the public from the risk of repeat offenses by perpetrators of sex crimes, deemed inherently susceptible to recidivism. (See, People v Cropper, 170 Misc 2d 631, 635 [Monroe County Ct 1996].) It was also enacted to comply with the Federal Violent Crime Control and Law Enforcement Act of 1994, subchapter VI, “Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program” (42 USC § 14071; see, L 1995, ch 192, § 1; People v Ross, 169 Misc 2d 308, 309 [Sup Ct, NY County 1996]). The Act requires that sex offenders be assessed a “risk level” at the time of sentence or prior to release from incarceration. The sentencing court bears the responsibility to make such determination either initially or, for incarcerated offenders, following receipt of the recommendation of a statutorily created Board of Examiners of Sex Offenders (the Board) whose duty it is to evaluate the probability of recidivism on the part of the offender based on certain statutory criteria contained in Correction Law § 168-Z (5). The offender is entitled to notice of the risk evaluation proceeding and may request a hearing. Unfortunately, the Act contains several procedural anomalies which have created confusion in implementation and interpretation.
As to all offenders incarcerated at or subsequent to the effective date, the Act requires the Board to “recommend” to the “sentencing court”, prior to the release of such offender, whether the offender warrants a designation as a “sexually violent predator” (Correction Law § 168-Z [6]) and the degree of risk of re-offense posed by such offender based upon the Risk Assessment Guidelines and Commentary (Guidelines) formulated by the Board pursuant to Correction Law § 168-Z (5). The “risk level” will determine the extent of public notification permissible: level one, low risk, permits notice only to law enforcement agencies; level two, moderate risk, provides for *322 notice to enforcement agencies which, in turn, may disseminate the offender’s approximate address by zip code, photograph, crime, modus of operation, victim type and special conditions imposed to any entity with a vulnerable population which may also further disseminate such information at its discretion; level three, high risk, also statutorily deemed a “sexually violent predator”, provides for notice to law enforcement agencies and subsequent dissemination as provided for a “moderate” risk offender, but also permits disclosure of the offender’s exact address. (Correction Law § 168-Z [6].) In addition, all of these particulars are included in a sexually violent predator subdirectory and are available to the public upon request (see, § 168-q). Section 168-h mandates annual registration for 10 years following initial registration within 45 days of release for all offenders regardless of risk. Sexually violent predators must also “verify quarterly” (Correction Law § 168-h).
Section 168-n of the Correction Law places upon the sentencing court the duty to actually determine the risk level, following receipt of the Board’s recommendation, 30 days prior to release. The statute further accords the offender the right to be present with counsel at a hearing and to present “materials” (Correction Law § 168-n [3]). It is this process that has caused great confusion. Some courts have deemed this a sort of administrative review by the court, according deference to the Board’s determination unless arbitrary or capricious. (See, People v Brasier, 169 Misc 2d 337 [Sup Ct, Bronx County 1996]; People v Ross, supra, 169 Misc 2d, at 312; cf., People v Ayten, 172 Misc 2d 571 [Sup Ct, Queens County 1997].) While this view is consistent to some extent with recent decisions in the appellate courts sustaining as regulatory, as opposed to punitive, and not, therefore, violative of the Ex Post Facto Clause, the retroactive application of the Act to offenders whose crimes were committed prior to the effective date of the Act (Doe v Pataki, 120 F3d 1263 [2d Cir 1997]), and denying standing to bring an appeal from a risk determination under the Criminal Procedure Law finding that the procedure under the Act is not part of a criminal action or its final adjudication (People v Stevens, 91 NY2d 270 [1998]), the statutory scheme suggests to this court that the Legislature did not intend to place upon the criminal courts of this State a burden to act merely as a regulatory body to confirm the determination of the Board. Such role would be inconsistent with the provision for a hearing and submission of additional “materials” before the sentencing court. (Accord, People v Salaam, 174 Misc 2d 726, 733 [Sup Ct, *323 NY County 1997]; People v Nieves, 172 Misc 2d 346, 351 [Sup Ct, Bronx County 1997].)
Rather, this court finds the assessment mandated under section 168-n to be a judicial proceeding in which the court must make a de novo determination, giving due consideration to the recommendation of the Board, composed of experienced members of the Division of Parole and Department of Probation with substantial expertise in the behavior and treatment of sex offenders, the documentation upon which the Board relied in making its assessment, together with any statement provided by the victim and any “materials” or testimony submitted by the offender. While the Board’s recommendation and the expertise reflected in the Guidelines is an appropriate reference, the statutory factors should be evaluated by the court independently in making its assessment of risk since the court is required by statute to consider evidence and argument not before the Board. The burden of proof is upon the State, represented here by the Attorney-General, to establish a basis for the proposed risk level by clear and convincing evidence. This standard of proof is set forth in the Board’s own Guidelines (at 5, 7 [Jan. 1996]; see, People v Salaam, supra; People v Sumpter, 177 Misc 2d 492 [Crim Ct, Queens County 1998]).
FACTS OF THE CASE
Rafael Jimenez was arrested on March 5, 1993, and charged with rape in the first degree under Penal Law § 130.35 (3), sex abuse in the first degree, and endangering the welfare of a child based upon the complaint of 10-year-old Jamila who stated defendant had removed her clothing, spread her legs, and placed his penis inside her vagina. He later gave her $5 to keep secret what had happened. The sex abuse charge was dismissed upon a technical error in the Grand Jury presentation. Defendant was also charged in the same indictment with endangering the welfare of the child Gladys, age 15, who was photographed by defendant, both with her consent and surreptitiously, in her underwear following her refusal of defendant’s requests for “sexual contact.” There was no admission to this accusation although the minutes of Gladys’ Grand Jury testimony and one of the photographs submitted by the District Attorney do provide the necessary clear and convincing evidence that such incident took place.
On April 6,1994, defendant pleaded guilty before now-retired Justice Thaddeus Owens to attempted rape in the first degree *324 with respect to the allegations concerning Jamila.[1] The then-58-year-old defendant, a live-in friend of Jamila’s grandmother with whom both Jamila and Gladys also resided, admitted he had “had sex” with Jamila and knew she was “under eleven.” On April 18, 1994, defendant was sentenced to one and a half to four and a half years’ incarceration. Defendant was released from prison on March 1, 1996.[2]
On May 12, 1997, defendant Jimenez appeared in response to notice and was appointed counsel. Challenging his recommended assessment at risk level two, pursuant to Correction Law § 168-n (3), on August 25, 1997 defendant requested a hearing. A full hearing was held on December 17, 1997.
At hearing, the State offered the risk assessment instrument (Instrument) for defendant, the testimony of Board member Terry Tamer who prepared the assessment instrument, the case summary provided to the court and, from the District Attorney, the Grand Jury minutes containing the testimony of the alleged second victim Gladys together with photocopies of some photographs, and defendant’s allocution of April 6, 1994, in which he acknowledged he “had sex” with Jamila knowing that she was under 11. Defendant submitted the Board’s Risk Assessment Guidelines and Commentary in effect at the time of defendant’s evaluation, dated January 1996 (since amended), the case summary and attached probation presentence report and defendant’s case history from the Division of Criminal Justice Services which was also used in his Board evaluation and which erroneously listed rape charges with forcible compulsion for the crimes at issue in this proceeding.
*325 Pursuant to the mandate of Correction Law § 168-1 (5), the Board developed a risk assessment instrument attributing points to be allocated to the various statutory factors in determining the risk of recidivism posed by any particular offender. (See, discussion of the development of the Guidelines and Instrument in People v Salaam, supra, 174 Misc 2d, at 729-730, and People v Cropper, 170 Misc 2d 631, 634-636, supra.) For defendant Rafael Jimenez, the Instrument presented at hearing allocates a total of 85 points as follows: 10 points for use of forcible compulsion; 25 points for “sexual intercourse, deviate intercourse, or aggravated sexual abuse [not ‘statutory rape’]” (Risk Assessment Guidelines and Commentary, Factor 3); 20 points for two victims; and 30 points for a victim under 10 years of age. Defendánt had no criminal history and received no additional points for “Past-Offense Behavior” (id., Ill) or “Release Environment” (id., IV). No points were added under Factor 14, “Supervision” following release because, at the time, defendant was to be supervised by a parole officer with expertise in handling sex offenders. Release without supervision warrants the addition of 15 points. Since defendant is no longer under supervision, the District Attorney has suggested that 15 points should be added to defendant’s recommended risk factor score of 85. His Board-recommended “Presumptive Risk Level” is two, moderate. There is no indication on the Instrument suggesting “override” or “departure” from the level recommended based upon the numerical scoring. Scores between 0 and 70 points indicate low risk, 75 to 105 points represent moderate risk, and 110 to 130 points is high risk.
Defendant takes issue with the allocation of 10 points for forcible compulsion, noting that the charges were based exclusively on the age of the victim and contain no allegations of force. He also challenges the allocation of 20 points for two victims, noting that only the charge of endangering the welfare of a minor relates to a separate victim, for which there was no admission or conviction. Defendant contends, moreover, that this crime is not one of those listed in the statute as a “sex offense” (Correction Law § 168-a [2]) and should not, therefore, be considered in determining his risk level. Were defendant to succeed in his arguments, he would become a level one offender according to the Board’s scheme of assessment.
*326 DISCUSSION
(D
New York’s Sex Offender Registration Act, Correction Law § 168-a (3), defines a “sexually violent offense” as “a conviction of or a conviction for an attempt to commit any of the provisions of sections 130.35, 130.50, 130.65, 130.67 and 130.70 of the penal law”. A “sexually violent predator” is “a person * * * convicted of a sexually violent offense * * * or a sex offender * * * who suffers from a mental abnormality that makes such person likely to engage in predatory sexual conduct” (Correction Law § 168-a [7]). Given defendant’s conviction for an attempt to violate Penal Law § 130.35, he clearly is defined by statute as a “sexually violent predator”. Such characterization does not, however, alone require the presumption that defendant poses the highest risk of recidivism. Section 168-n of the Correction Law directs that the sentencing court first determine whether the defendant is a sex offender or a sexually violent predator and then determine the level of notification. The Board’s Guidelines also interpret the Act to require an individualized evaluation of risk (Risk Assessment Guidelines and Commentary, at 2, 2 [“General Principles”]).
It is the public notification provisions that distinguish the various risk levels since all sex offenders must register annually for 10 years unless relieved of this obligation by the court. As a sexually violent predator, defendant Jimenez is also required to “verify” his address quarterly, not as a function of his risk level designation, but based upon the nature of his conviction. (See, Correction Law § 168-h.) The statute provides that the court may relieve a sexually violent predator of the duty to verify quarterly if it finds “that the person no longer suffers from a mental abnormality that would make him likely to engage in a predatory sexual violent offense” (ibid,.). Such language suggests an intent to make the presence of a “mental abnormality” a necessary element of the sexually violent predator designation. The New York statute does not, however, so provide, but, unlike the Federal Act, defines such predator in the disjunctive: an offender convicted of a designated crime or an offender “who suffers from a mental abnormality” (Correction Law § 168-a [7]).[3] There is no indication in the record before the court in either the Instrument or the presen *327 tence investigation report that defendant ever suffered from a diagnosed mental abnormality. In light of the language of section 168-a, however, the defendant will be required to verify his address with authorities quarterly. He will also be listed in the sexually violent predator subdirectory as provided in section 168-q.
(2)
Turning to the evaluation of the level of risk of recidivism posed by defendant, this court finds defendant’s arguments to be well founded.
Defendant argues that 10 points were improperly added to his risk score for forcible compulsion when no allegations of force are contained in the charges and the defendant did not in any way acknowledge the use of force. This court has not been afforded the opportunity to review the Grand Jury testimony of Jamila and has no firsthand knowledge of her description of the incident. Nor did the Board have access to Grand Jury minutes or seek to independently obtain a reliable account of the incident. The presentence investigation report indicates that as early as April 1994, neither complainant nor her mother could be reached and no “victim’s statement” is contained in the record. The only description of the rape is apparently derived from court or District Attorney files. The presentence investigation report indicates: “the def. told * * * Jamila [name deleted], age 10, to lay down. The def. then took off the c/w’s [complaining witness’] clothes, opened up the c/w’s legs and placed his penis inside the c/w’s vagina. The def. gave the c/w money not to tell anyone.” There is no mention of threats or violence of any kind. Although , an inference of physical trauma necessarily caused by the penetration of a 10-year-old girl by a 58-year-old man can be made, there is no evidence of injury. Factor 5, “Age of Victim”, which allocates 30 points for a victim age 10 or less, would appear to cover this circumstance.
Penal Law § 130.35 (3) does not require proof of force but merely that the victim be “less than eleven years old.” Although there are cases which suggest that differences in age and size between perpetrator and victim may be sufficient to *328 constitute the force necessary to prove “forcible compulsion” where the charges are brought under Penal Law § 130.35 (1) (see, People v Fuller, 50 NY2d 628 [1980]; People v Yeaden, 156 AD2d 208 [1st Dept 1989]), those cases are distinguished by the presence of testimony of some physical act of actual restraint and, more importantly for the purpose of the issue at bar, the charges alleged the actual use of force and were not, as here, premised exclusively on the age of the victim.
At the hearing, Mr. Tamer testified that the assessment of 10 points for forcible compulsion “was based upon the information from the NYSID rap sheet, which shows under the instant conviction, that forcible compulsion was used” (transcript, Dec. 17, 1997, at 14). The “NYSID rap sheet” used by the Board was actually a “New York State Computerized Case History” (defendant’s exhibit B in evidence) which, as aforenoted, erroneously characterizes the conviction in this case as “att rape— ist: forcible compulsion pl 130.35 sub oi”. Mr. Tamer stated that he had not inferred the use of force based on the lack of consent due to age but had believed actual force was used. He acknowledged that had he been aware that the conviction was based on inability to consent because of age, the 10 points would not have been added.
Moreover, the Guidelines, which were devised by the Board and govern their evaluation, expressly state (Risk Assessment Guidelines and Commentary, at 5, 7 [Jan. 1996]): “Points should not be assessed for a factor — e.g., the use of a dangerous instrument — unless there is clear and convincing evidence of the existence of that factor * * * For example, where a defendant is indicted for rape in the first degree on the theory that his victim was less than 11 (Penal Law §130.35(3)), but not on the theory that he used forcible compulsion (Penal Law §130.35(1)), the Board or court should be reluctant to conclude that the offender’s conduct involved forcible compulsion.” (But see, Matter of Youngs v Division of Probation & Correctional Alternatives, 175 Misc 2d 51, 54 [in which the court sustained the assessment of points where there existed evidence of force notwithstanding that the indictment did not charge forcible compulsion].) Given this caveat, together with the factual error in the information used by the Board in making its assessment, there is no question but that defendant must prevail in his challenge to the 10 points assessed for forcible compulsion.
*329 (3)
Defendant also argues that the addition of 20 points for two victims was erroneous in light of his admission to only the one count involving Jamila. Again referencing the Guidelines, the Board itself acknowledges: “The fact that an offender was arrested or indicted for an offense is not, by itself, evidence that the offense occurred” (Risk Assessment Guidelines and Commentary, at 5, If 7 [Jan. 1996]). Mr. Tamer testified, however, that the Board would consider evidence of other crimes in making its risk assessment even where an admission had been made, as here, to only one crime. This position is consistent with the amended Guidelines established by the Board. (See, Risk Assessment Guidelines and Commentary, at 5, If 7 [June 1997] [“(T)he Board is not limited to the crime of conviction”].) It is also reasonable in light of the purpose of the evaluation to protect vulnerable populations from serious predators, provided there is clear and convincing evidence that such additional crimes were in fact committed by the offender.
Mr. Tamer testified that “ [according to [his] understanding, information in the presentence investigation report is considered to be clear and convincing evidence” (transcript, Dec. 17, 1997, at 16). Given the speculative source of the information contained in that report, this court does not agree that the hearsay description of untried and unadmitted allegations should be so credited. There was not sufficient evidence before the Board to support its addition of 20 points for two victims. However, the District Attorney has supplied to the court the Grand Jury testimony of the second complainant and has also provided copies of the photographs alleged to have been taken by defendant. Such evidence is clear and convincing proof that between August 1 and August 31 of 1992, defendant took photographs of Gladys in her underwear. Gladys further testified that, prior to the photographs being taken, defendant had “told me to have sexual contact with him, but I said no” (Grand Jury minutes, at 5). While it appears that no such “contact” ever took place with respect to 15-year-old Gladys, defendant’s persistence in ultimately securing the desired gratification from her younger sister makes his overtures to Gladys relevant in assessing his risk. It is noted, moreover, that, although present at the hearing, defendant did not deny the charges concerning Gladys.
Defendant further argues that because his alleged transgression with respect to Gladys resulted in a charge of only the misdemeanor crime of endangering the welfare of a child under *330 Penal Law § 260.10, which is not one of the sex oifenses enumerated in section 168-a (2) and (3) of the Correction Law, the complainant in that charge may not be considered a second victim for purposes of risk assessment. At hearing, Mr. Tamer acknowledged that a conviction for endangering the welfare of a child would not alone subject an offender to the Act and require registration, but, relying on the Guidelines instructions for Factor 9: “Number and Nature of Prior Crimes”, in which 30 points may be assessed for a prior conviction for endangering the welfare of a child, Mr. Tamer indicated that the Board would treat this crime “as if it were a sex crime” in making an evaluation if sexual misconduct was involved (transcript, Dec. 17, 1997, at 40). The Guidelines state, with reference to Factor 9 and the treatment of a prior crime: “The Board determined to treat endangering the welfare of a child as if it were a sex crime since it generally involves sexual misconduct, especially when it is part of a plea bargained disposition. Where a review of the record indicates that there was no such misconduct, a departure may be warranted.” (Risk Assessment Guidelines and Commentary, at 13 [Jan. 1996].)
Of course, this rationale, while certainly reasonable, does not answer defendant’s argument that he did not admit the allegations respecting Gladys and should not be penalized based on a mere allegation. The Board’s use of a prior adjudication of the crime of endangering the welfare of a child under Factor 9 of “criminal history” is not the same as using a nonadjudicated accusation as an element in determining the number of victims in the “current offense”. However, as previously noted, there is clear and convincing evidence in the sworn testimony of complainant before the Grand Jury that defendant engaged in sexual misconduct toward her which has not been denied by defendant. Since the additional points will not result in any “penalty’ to defendant in that the purpose of the Act is to assist law enforcement in a regulatory context only (see, People v Stevens, 91 NY2d 270, supra), evidence of sexual misconduct toward a second victim was properly considered in determining defendant’s risk to the community. As noted in the Guidelines (at 9-10 [Jan. 1996] [“Factor 3”]): “The existence of multiple victims is indicative of compulsive behavior, and is therefore a significant factor in assessing the offender’s risk of reoffense and dangerousness.” Twenty points were properly assessed for two victims.
*331 (4)
Finally, the District Attorney suggests that 15 additional points should be added to defendant’s risk score because he is no longer supervised by a parole officer with special expertise in dealing with sex offenders as he was at the time of his release. Defendant was released to parole on March 1, 1996, having served at least the minimum of a sentence of one and a half to four and a half years imposed on April 18, 1994. On September 3, 1997, he completed his sentence and is therefore no longer within the jurisdiction of the Division of Parole. To grant the District Attorney’s application now, two and a half years after his release, solely because his sentence has been concluded, would be arbitrary and irrational and inconsistent with the purposes of the Act. The District Attorney’s argument here is equally applicable to every convicted offender and, if accepted, would require the eventual assessment of 15 additional points to every offender who has completed his sentence, regardless of the risk he actually poses. There is no authority for such assessment in the Act or the Guidelines. “Factor 14: Supervision” is clearly intended to apply only to the immediate circumstances at the time of release from incarceration when the offender reenters the community (see, Risk Assessment Guidelines and Commentary, at 15 [Jan. 1996]). The request to assess 15 points for lack of supervision is denied.
(5)
Using the scoring set forth in the risk assessment instrument, including 20 points for two victims and disallowing 10 points for forcible compulsion, defendant’s presumptive risk level is moderate based upon a modified score of 75. This is the threshold score for level two risk.
Defendant is 62 years of age and was steadily employed in New York City for over 30 years as a jewelry polisher. He has no prior criminal history and has admitted his crime and participated in a six-week sex offender program. While his living situation is somewhat unstable in that he has resided in various men’s shelters since his release, according to the probation report, he has a daughter who resides in the Bronx. The crime he committed against Jamila was truly egregious, but it was a crime of opportunity in that defendant was residing with her in her grandmother’s home and neither sought her out for victimization, nor was he a stranger to her. Defendant suffers from poor eyesight and a heart condition and is supported by disability benefits. He appears to pose little risk of re-offense in *332 the community at large. As a sexually violent predator, he will be listed in the sexually violent predator subdirectory and required to verify his address quarterly and, as an adjudicated sex offender, his name may be accessed by the public through the “900” telephone number (Correction Law § 168-p). Given the totality of the circumstances, this court finds that a deviation from the presumptive risk level is warranted and defendant is properly classified as a level one, low risk, offender. The appropriate agencies shall be so notified.

. One of the anomalies of the statutory scheme which warrants legislative reconsideration is the referral back to the “sentencing court” for risk assessment of offenders who have been incarcerated for many years. As happened here and with two other cases before me, the Judge who imposed sentence and was personally familiar with the facts of the case is no longer on the Bench. It would be both more appropriate and more efficient, in my view, to assess risk level at the time of sentence. This would also permit incorporation of the risk assessment into the allocution when there is a plea disposition. If modification of the risk level is necessary based upon defendant’s incarceration history or release environment, a review could then be initiated either by the correctional authorities or by the defendant.

. Defendant Jimenez is within that category of defendants convicted and incarcerated prior to the effective date of the statute who brought suit in the Federal court, Southern District of New York, challenging the application of the statute to them as a violation of the Ex Post Facto Clause. His risk assessment was deferred pending resolution of that issue in Doe v Pataki (120 F3d 1263 [2d Cir 1997], supra). Since Mr. Jimenez did in fact appear pursuant to notice, the sufficiency of the notice is not an issue here.

. The Federal Act, however, upon which New York’s statute is modeled, expressly requires the presence of a mental abnormality or personality disorder in order to find an offender a sexually violent predator. The Federal Act *327 (42 USC § 14071 [a] [3]) provides: “(C) The term ‘sexually violent predator’ means a person who has been convicted of a sexually violent offense and who suffers from a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses” (emphasis added). (See, 42 USC § 14071 [a] [3] [D], [E] for definitions of “mental abnormality” and “predatory”.)